DECISION. *Page 3 
{¶ 1} Defendants-appellants the city of Cincinnati ("the city"), the West End Community Council and various allied individuals ("WECC"), and Omar Childress appeal the trial court's judgment reversing the decision of the city's Zoning Board of Appeals ("the ZBA") that plaintiff-appellee CityLink Center was a "community service facility" and thus not a permitted use in the applicable zoning district. The ZBA had determined that CityLink was not entitled to a Zoning Certificate of Compliance that had been issued to it for its proposed use of its property located in the West End neighborhood of Cincinnati. Because the ZBA's decision was unreasonable and not supported by a preponderance of substantial evidence, we affirm the judgment of the trial court.
 I. What is CityLink? {¶ 2} The following undisputed facts are taken from the administrative record. CityLink is a not-for-profit corporation organized by a combination of Cincinnati churches and ministries. Its intended purpose is to create a "centralized hub of services" to assist the low-income population in Cincinnati in becoming more fully contributing members of society. After conducting a search from the Norwood Lateral to the Ohio River, CityLink selected the property at 810 (a.k.a. 800) Bank Street in the West End neighborhood of Cincinnati. The property is a five-acre parcel with two vacant buildings, and it is zoned Manufacturing General ("MG").[1] The size of the property will allow it to be developed according to "Crime Prevention Through *Page 4 
Environmental Design," which includes secure entrances, improved lighting, fencing, and good visibility for law enforcement.
 {¶ 3} CityLink intends to lease space in a renovated building to four main tenants: (1) Jobs Plus, which provides job placement, training and other employment services; (2) Crossroads Health Center, which provides health screenings, dental care, pregnancy tests and wellness services; (3) The Lord's Gym, which provides weightlifting, exercise and wellness programs; and (4) City Gospel Mission, which provides long-term transitional housing for people involved in CityLink's programs. Further, other entities, such as a café, a day-care center, and a barber and beauty salon will be located within CityLink. All of these entities have separate legal identities, separate governing boards, and independent control over the services they will provide to their clients.
 {¶ 4} CityLink will not be open to the general public. Its services will be provided to those who stay in the transitional housing and to any other client that has completed the intake process to determine eligibility for and commitment to the services to be provided. There will be some charge for clients utilizing the café, which will serve breakfast and dinner, but there will be no charge for the day-care facility that will be used by clients living in the transitional housing and by CityLink's staff and volunteers.
 II. The Zoning and Appeal {¶ 5} In December 2005, the city's Director of the Department of Buildings and Inspections issued a Zoning Certificate of Compliance for the property located at 800 Bank Street, certifying that CityLink's intended use of the property to house "professional offices, transitional housing, recreational facility, accessory day care, *Page 5 
barber and beauty salons, and a café" properly conformed to the city's zoning code.[2] The director met with representatives of CityLink and consulted with the city's law department prior to issuing the zoning certificate. After receiving zoning approval, CityLink purchased the property for $1.4 million.
 {¶ 6} WECC and Childress, an individual who owns property abutting the property purchased by CityLink, filed appeals with the city's ZBA, requesting that it reverse the director's decision. The ZBA held a hearing in February 2006. As a result of significant public opposition to CityLink, a few days prior to the hearing Cincinnati's city council passed a resolution "expressing City Council's opposition to the placement of the CityLink Center at 800 Bank Street in the West End." Although WECC attempted to have this resolution admitted into evidence at the ZBA hearing, the ZBA excluded the resolution, noting that the duty before it was to determine if the intended uses of CityLink's property were permitted in the MG district. But the ZBA had allowed into evidence 14 letters to the ZBA from nearby community groups, churches, and business groups opposing CityLink, despite the fact that none of the letters addressed the zoning issue.
 {¶ 7} Immediately after the hearing, the ZBA announced its decision reversing the director's issuance of the zoning certificate. In its written decision, the ZBA determined that CityLink was a "community service facility" ("CSF"), which was not a permitted use in the MG zoning district. The ZBA concluded that the director's decision was "not consistent with the intent and purpose of the Zoning Code."
 {¶ 8} CityLink appealed to the Hamilton County Court of Common Pleas under R.C. 2506.04. WECC also filed an appeal to preserve the issue that the ZBA had erred in excluding relevant evidence. These appeals were combined and referred *Page 6 
to a magistrate. The magistrate determined that the ZBA's conclusion that CityLink was a CSF that was not permitted in the MG district was supported by the preponderance of substantial, reliable, and probative evidence. Further, the magistrate rejected CityLink's argument that its proposed uses were permitted in the MG district, stating that "[e]ach individual entity would contribute to CityLink's obvious philanthropic purpose. The purpose of the facility, and not its individual functional uses, is what makes CityLink a `community service facility.'"
 {¶ 9} CityLink filed objections. The trial court sustained those objections and reversed the ZBA's decision, concluding that (1) the proposed uses of CityLink were permitted in the MG district; (2) CityLink was not a CSF because its services were not limited to the community or neighborhood where it was to be located, and because it had many commercial aspects; and (3) the ZBA had not made the required findings and thus could not have overturned the director's decision.
 {¶ 10} Accordingly, the trial court ordered that a zoning certificate of compliance be reissued to CityLink. The city, WECC, and Childress have timely appealed.
 III. The Instant Appeal {¶ 11} In its single assignment of error, the city contends that the trial court abused its discretion in reversing the decision of the ZBA. Under this assignment of error, the city's arguments are substantially similar to the first, second, third, fourth, fifth, and sixth assignments of error set forth in WECC's appellate brief and the assignment of error set forth in Childress's brief. Accordingly, we address these assignments of error together. Our reference to the term "the city" includes WECC and Childress unless we indicate otherwise. *Page 7 
 {¶ 12} This court's review of an administrative appeal is extremely deferential. We cannot independently weigh the evidence and are limited to reviewing questions of law and determining whether the trial court abused its discretion when weighing the evidence.[3] An abuse of discretion "connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude on the part of the court."[4]
 {¶ 13} Because this case is about zoning, we acknowledge that as a general rule zoning laws may only regulate uses of land and not the identity of users of the land.[5] Further, it is well established that zoning resolutions are to be strictly construed in favor of the property owner because "zoning resolutions are in derogation of the common law and deprive a property owner of certain uses of his land to which he would otherwise be lawfully entitled."[6]
 {¶ 14} The city argues that the trial court abused its discretion in reversing the ZBA's determinations that CityLink was a CSF and that CityLink's proposed uses were not permitted in the MG zoning district. We are unpersuaded.
 IV. CityLink's Proposed Uses {¶ 15} The MG district, out of the over 20 different zoning districts in the city, is ranked as the city's "least restrictive." Cincinnati Municipal Code 1413-05 lists the following as permitted uses in the MG district: (1) "transitional housing," defined in part as "housing designed to assist persons in obtaining skills necessary for *Page 8 
independent living in permanent housing"; [7] (2) "personal instructional services," defined in part as "the provision of instructional services," which includes, among other things, tutoring;[8] (3) "offices," defined in part as "a facility for a firm or organization that primarily provides professional, executive, management or administrative services";[9] (4) "indoor or small-scale recreation and entertainment," defined in part as "small, generally indoor facilities, * * * including fitness centers";[10] and (5) "medical services and clinics," defined in part as "offices organized as a unified facility for more than two (2) licensed physicians, dentists, chiropractors, or other health care professionals."[11]
 {¶ 16} The Gospel City Mission, one of CityLink's tenants, will provide transitional housing for its clients. Jobs Plus will house its administrative office at CityLink and will provide its clients with job-placement services, including interview training and resume writing, which qualify as "personal instructional services" or an "office" as defined in the zoning code. And depending on the number of health-care professionals, Crossroads Health Center constitutes a "medical service or clinic" or an "office" as defined by the zoning code. Finally, the Lord's Gym, which will offer a fitness center and wellness programs to its clients, qualifies as "indoor or small-scale recreation and entertainment" as defined by the code. Accordingly, all of CityLink's uses are permitted in the MG district, which implies that each use supports the purpose of the MG district and does not inhibit industrial development as the dissent asserts. *Page 9 
 {¶ 17} The city, however, contends that for these uses to be permitted in the MG district they must be "commercial" in nature, which, according to the city, means that the recipients of the services must pay for the services and the services must be provided by a "for-profit" entity. But the term "commercial" does not appear in the definitions for "personal instructional services," "medical offices or clinics," "offices," "transitional housing," and "recreation and entertainment." Further, those definitions do not distinguish between uses by a nonprofit entity and uses by a profit-seeking entity. And that is most likely because the fact that CityLink's tenants may provide services at a reduced rate, as opposed to other entities who may charge the "market" rate for the same services to people with a higher income, does not change the way that the land will be used or the impact of such use on the zoning district.
 {¶ 18} For example, the MG district permits retail stores of less than 10,000 square feet. Under the city's theory, a clothing store operated by a nonprofit entity such as Goodwill would not be permitted in the MG district, but another retail store, such as a Payless Shoes, that charges market rates would be permitted. This cannot be what the zoning code intends or desires, since zoning laws are meant to group similar uses of land together.
 {¶ 19} Additionally, we note that even if "commercial" means that recipients of services must pay for them, there is no evidence in the record that CityLink's tenants will be providing their services at no charge. But there is testimony that CityLink will charge for services if required by the zoning code. For example, a fee must be charged to operate a café in the MG District, and CityLink's director testified that there would be a fee charged. *Page 10 
 {¶ 20} Because there is substantial evidence in the record supporting the determination that CityLink's uses are permitted in the MG district, we conclude that the trial court's reversal of the ZBA's determination that CityLink's proposed uses were not permitted was reasonable and thus not an abuse of discretion.
 V. Community Service Facility? {¶ 21} A CSF is not a permitted use in the MG district. Cincinnati Municipal Code 1401-01-C14 defines a CSF as "a noncommercial facility established primarily for the benefit and service of the populations of the communities in which they are located, such as YMCA or YWCA facilities, boys and girls clubs, and offices of community councils, non-profit civic, religious, welfare, or philanthropic organizations."
 {¶ 22} In this case, we hold that the trial court's determination that CityLink was not a CSF because it was not established primarily for the benefit and service of the residents of the West End neighborhood of Cincinnati was reasonable and supported by substantial evidence in the record.
 {¶ 23} CityLink was created to be a "centralized hub of services" catering to the low-income population of Cincinnati and Hamilton County. The sponsors of CityLink come from many different neighborhoods in Cincinnati. CityLink anticipates taking referrals from Hamilton County courts-this will clearly benefit individuals throughout the county and not just the residents of the West End.
 {¶ 24} Further, at the ZBA hearing, Neal Sundermann, CityLink's commercial realtor, testified that he had conducted a search of properties from the Norwood Lateral to the Ohio River for buildings over 40,000 square feet that were near or accessible to bus lines. He said that his search revealed 15 buildings, but many of them did not have adequate parking or were in out-of-the-way locations that did not *Page 11 
have access to the bus lines. He testified that CityLink finally settled on the Bank Street property because (1) one of the buildings on the property could be renovated; (2) the property consisted of five acres and had adequate parking; and (3) it was within "nine-tenths of a mile" of the current location of each organization that was planning to relocate to CityLink; and (4) it was on major thoroughfares, with access to bus lines.
 {¶ 25} It is clear from this undisputed testimony that CityLink was not targeting West End residents as the primary recipients of CityLink's services. The property in that neighborhood just happened to satisfy CityLink's needs because it was large enough to accommodate parking and it was near bus lines that will enable individuals from throughout Hamilton County to use CityLink's services.
 {¶ 26} WECC argues that CityLink's promotional literature indicates that West End residents will benefit greatly from CityLink, and that this proves that CityLink was established primarily to serve the West End. But the record demonstrates that most of the literature distributed to West End residents was in response to their opposition to CityLink's purchase of the property-the letters from residents and business groups in the West End indicate that they were fearful that CityLink would attract dangerous, "undesirable" people and sexual predators to the neighborhood. CityLink has indicated that it will not be providing services to sexual predators, and in its literature it simply attempted to outline some benefits to CityLink's location in the West End neighborhood. And while some residents of the West End may benefit from CityLink's services, the record clearly shows that CityLink was not created primarily to serve the West End.
 {¶ 27} We also reject WECC's argument that the term "communit[y]" in the definition of a CSF refers to a larger area than just a "neighborhood," because a *Page 12 
review of the zoning code demonstrates that "community," when associated with the phrase "community council," refers to a specific neighborhood.[12] And we also reject the assertion that CityLink is similar to a YMCA or a boys and girls club, which are prohibited in the MG district. Those types of organizations are single-user facilities that are scattered throughout many different neighborhoods, and that are meant to primarily serve the residents in the area where each is located. In contrast, CityLink is a multi-purpose center established to serve the whole county, and thus there is only a single location.
 {¶ 28} The trial court also determined that CityLink has many commercial aspects, although it is a nonprofit organization. But the city argues that CityLink is not a "commercial" entity. We are unpersuaded. The United States Supreme Court, noting that "a nonprofit entity is ordinarily understood to differ from a for-profit corporation principally because it is `barred from distributing its net earnings, if any, to individuals exercising control over it,'" has held that nonprofit entities do engage in commerce.[13] They can do so by purchasing goods and services in competitive markets, by offering their facilities to a variety of people, and by deriving revenue from a variety of sources. Although CityLink will do all of those things that indicate that it will be engaged in commerce, even if we were to hold that CityLink is a "noncommercial facility," CityLink would not constitute a CSF because it was not established primarily to serve the community in which it will be located.
 {¶ 29} Finally, we note that the magistrate, in agreeing with the ZBA that CityLink was a CSF, based that conclusion on the fact that CityLink's purpose in using the land was philanthropic. But the magistrate never addressed one of the *Page 13 
essential requirements of a CSF — whether it was established to primarily serve the community in which it will be located. By looking only at CityLink's purpose, which is similar to considering its not-for-profit status, the magistrate elevated purpose over use of the land. That was improper. Zoning laws regulate use of the land, not the motivation behind the use.
 {¶ 30} Finally, we find it relevant that each use that CityLink will engage in on the property is specifically permitted in the MG district. Simply because these uses will be housed under one roof does not transform the use of the land into a CSF. The evidence demonstrates that each of CityLink's tenants has a separate legal identity and a separate governing board.
 {¶ 31} Accordingly, because the ZBA's decision was unsupported by substantial evidence in the record, we hold that the trial court did not err in sustaining CityLink's objections to the magistrate's decision and reversing the ZBA's decision.
 VI. The ZBA's Findings, Bias, and Constructive Taking {¶ 32} The city next argues that the trial court erred in reversing the ZBA's decision (1) because it found that the ZBA did not make any of the required findings prior to reversing the director's decision; (2) because it concluded that the ZBA was biased and under extreme political pressure; and (3) because it concluded that the ZBA's decision constituted a "constructive taking" of CityLink's property. Regardless of whether these conclusions are supported in the record, they are not pertinent to the trial court's ultimate decision that CityLink's uses are permitted in the MG district and that it is not a CSF. Because those two determinations are supported by the preponderance of the evidence in the record and are reasonable, the trial court *Page 14 
did not abuse its discretion in reversing the ZBA. Accordingly, the city's assignment and those that are substantially similar to it are overruled.
 VII. WECC's Remaining Assignments of Error {¶ 33} In its sixth, seventh, and eighth assignments of error, WECC asserts that the trial court erred in sustaining CityLink's objections to the magistrate's decision because it concluded (1) that CityLink's proposed uses were reasonable or fair; (2) that CityLink was entitled to use its property as proposed because it had relied upon approvals given by city employees; and (3) that CityLink had been discriminated against because it was funded by Christian organizations, had religious backing and was a nonprofit organization. Again, regardless of whether the trial court made these conclusions and regardless of whether they are supported in the record and in the law, they were not crucial to the trial court's decision in overruling the magistrate and reversing the ZBA. The trial court properly concluded, based on the zoning code and the evidence in the record, that CityLink is not a CSF and that its proposed uses are permitted in the MG district.
 {¶ 34} Accordingly, the three remaining assignments of error are overruled, and we enter final judgment in favor of CityLink and order the Director of the Department of Buildings and Inspections to reissue the Zoning Certificate of *Page 15 
Compliance.
Judgment accordingly.
GORMAN, J., concurs.
DINKELACKER, J., dissenting.
ROBERT H. GORMAN, retired, from the First Appellate District, sitting by assignment.
[1] See, generally, Cincinnati Municipal Code § 1400-15.
[2] See Cincinnati Municipal Code § 1441-07.
[3] Kohrman v. Cincinnati Zoning Bd. of Appeals, 165 Ohio App.3d 401,2005-Ohio-5965, 846 N.E.2d 890, at ¶ 7.
[4] Pembaur v. Leis (1982), 1 Ohio St.3d 89, 91, 437 N.E.2d 1199
[5] Ohio Valley Orthopaedics Sports Medicine, Inc. v. Bd. ofTrustees of Sycamore Twp., 158 Ohio App.3d 460, 2004-Ohio-4662,816 N.E.2d 1088 ("zoning laws regulated the `types of uses to which structures and property may be put,' not the identity of the users"); see, also, State ex rel. Parker v. Konopka (1963), 119 Ohio App. 513,515, 200 N.E.2d 695 ("Zoning ordinances or regulations refer to land use rather than to persons owning the land").
[6] Saunders v. Clark County Zoning Dept. (1981), 66 Ohio St.2d 259,261, 421 N.E.2d 152.
[7] Cincinnati Municipal Code § 1401-01-T.
[8] See Cincinnati Municipal Code §§ 1401-01-P10.
[9] See Cincinnati Municipal Code §§ 1401-01-O.
[10] See Cincinnati Municipal Code §§ 1401-01-T.
[11] See Cincinnati Municipal Code §§ 1401-01-M3.
[12] See Cincinnati Municipal Code Chapter 207 et seq. (explicitly linking "community councils" to "neighborhood leadership").
[13] Camps Newfound/Owatonna v. Town of Harrison (1988), 520 U.S. 564,585, 117 S.Ct. 1590.